Laurence M. ADDINGTON, David M. Cohn, John Sann and Marianne Sann, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

Docket Nos. 98–4145(L), 98–4146(CON), 98–4147(CON),99–4183(CON), 99–4187(CON), 99–4185(CON)

United States Court of Appeals, Second Circuit.

Argued: Oct. 13, 1999

Decided: Feb. 29, 2000

Stuart A. Smith, Law Office of Stuart A. Smith, Esq., New York, NY, for petitioners-appellants.

Joan I. Oppenheimer, U.S. Department of Justice, Tax Division, Washington, D.C. (Loretta C. Argrett, Assistant Attorney General; Ann B. Durney, on the brief), for respondent-appellee.

Before: WINTER, Chief Judge, NEWMAN, and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge:

Petitioners-appellants Laurence M. Addington, David M. Cohn, and John and Marianne Sann (collectively the "Taxpayers") appeal from the June 10, 1997 decision of the United States Tax Court (Howard A. Dawson, Jr., Judge, adopting the opinion of Special Trial Judge Norman H. Wolfe) upholding respondent-appellee the Commissioner of Internal Revenue's assessment of deficiencies, negligence penalties under I.R.C. § 6653(a)(1)-(2), and valuation overstatement penalties under I.R.C. § 6659 on their 1981 and 1982 federal income taxes. Taxpayers claim that the tax court erred in holding that (1) they were liable for the § 6653 negligence penalties, (2) the Commissioner did not abuse his discretion in refusing to waive the § 6659 valuation overstatement penalties; and (3) certain adjustments for tax year 1982 were not barred by the statute of limitations. We agree with the tax court's conclusions and affirm its decision.

## BACKGROUND

This case is one of more than two hundred that have arisen from tax-sheltered transactions involving the sale and lease-back of Sentinel recyclers, sometimes referred to as the Plastics Recycling programs. *See Provizer v. Commissioner,* 63 T.C.M. (CCH) 2531, 1992 WL 56983 (1992), *aff'd,* 996 F.2d 1216 (6th Cir.1993) (unpublished table decision) (describing underlying transactions). Taxpayers indirectly invested in three limited partnerships that leased Sentinel recyclers: Empire Associates ("Empire"), Plymouth Equipment Associates ("Plymouth"), and Foam Recycling Associates ("Foam") (collectively the "Partnerships"). The machines, manufactured by Packaging Industries, Inc. ("PI"), recycled plastic scrap material into pellets for use in producing recycled plastic. Taxpayers stipulated below to substantially the same facts concerning the underlying transactions as were at issue in *Provizer.* In *Provizer,* the tax court found that the Plastics Recycling programs were sham transactions, designed solely to obtain tax benefits.

During the taxable years at issue, Addington, Cohn, and John Sann ("Sann") practiced law as partners at Sann & Howe, a New York City law firm. In 1981, Sann & Howe hired Guy Maxfield, a professor of tax law at New York University School of Law, to act as a senior tax lawyer on an "of counsel" basis. Taxpayers learned about the Partnerships from Maxfield, whom they characterize as their "principal adviser" regarding their decision to invest. Maxfield, who has no background in engineering, plastics materials or plastics recycling, performed most of the research into the Partnerships on which Taxpayers relied.

Maxfield estimates that he spent about 50 to 75 hours investigating the investment. In the course of his research, Maxfield studied the offering memoranda and the accompanying tax opinions. He also conferred with Richard Roberts, the general partner of the Partnerships and the tax matters partner for Foam, and with John Y. Taggart, one of the attorneys retained by Roberts to prepare the offering memoranda and tax opinions for Empire and Plymouth. Taggart was a tax partner at the New York law firm Windels, Marx, Davies & Ives and Maxfield's close personal friend. Maxfield did not personally visit the PI plant in 1981, although another lawyer from Sann & Howe, Roger Wible, traveled to Hyannis, Massachusetts to tour

the plant. In 1982, Maxfield himself visited the plant to perform what he characterized as due diligence.

The Partnerships' offering memoranda cautioned that the investments entailed significant tax and business risks. The memoranda warned of a substantial likelihood of an IRS audit in which the valuation of the recyclers would probably be challenged; that the general partner had no experience in marketing recycling equipment; and that no established market existed for the recyclers. One of Maxfield's chief concerns was whether the recycling machines were appropriately priced. At a meeting with Addington, Cohn, and Sann, he suggested hiring an independent appraiser in the plastics industry to value the machines, but they did not act on his proposal. Instead of independently pricing the machines, Maxfield relied on the valuations provided in reports accompanying the offering circulars.

Addington, Cohn, and Sann themselves performed only limited research into the plastics recycling investment. Although they reviewed a copy of an offering memorandum, conferred with Maxfield, and held meetings to discuss the investment, they never independently investigated the opportunity. Taxpayers, who have no education or background in engineering, plastics materials or plastics recycling, never visited the PI plant to view the Sentinel recyclers or attempted to obtain a second opinion on the machines' value.

Although the fair market value of a Sentinel recycler during 1981–82 did not exceed $50,000, Taxpayers claimed operating losses and investment tax and business energy credits for those tax years based on an estimated value of $1,162,666 for each machine. In notices sent in 1988 and 1990, the Commissioner informed Taxpayers that deficiencies and penalties had been assessed against them for federal income tax years 1981 and 1982, respectively.

For tax year 1981, the deficiencies assessed against Addington, Cohn, and the Sanns amounted to $63,137, $10,250, and $192,666, respectively; for 1982, the respective amounts were $ 44,317, $15,893, and $94,403. The § 6653(a)(1) negligence penalties for tax year 1981 amounted to $3,156.85, $512.50, and $9,633.30; for 1982, they amounted to $2,215.85, $795, and $4,720.[1] The § 6659(a) valuation overstatement penalties for tax year 1981 amounted to $18,840, $2,892.30, and $54,582.60; for 1982, they amounted to $10,649, $4,020, and $23,030. Taxpayers challenged the additions to tax before the United States Tax Court, which upheld the Commissioner's assessments. This appeal followed.

## DISCUSSION

### A. The Negligence Penalties

■ Taxpayers challenge the Commissioner's imposition of negligence penalties for their underpayments of tax in 1981 and 1982. The tax court upheld the penalties because it found that Taxpayers, in calculating the operating losses and business and tax credits claimed on their returns, unreasonably relied on representations in the offering memoranda, which contained numerous caveats and warnings, and on Maxfield's advice. The tax court found that the record failed to establish that Maxfield possessed sufficient knowledge of the plastics or recycling industries to render a competent opinion, and that he had only conferred with individuals with an interest in the investment. We must uphold these findings unless they are clearly erroneous. *See Chimblo v. Commissioner,* 177 F.3d 119, 126 (2d Cir.1999) (citing *Goldman v. Commissioner,* 39 F.3d 402, 406 (2d Cir.1994)).

---

1. The Commissioner also assessed negligence penalties under § 6653(a)(2), which imposes a penalty equal to fifty percent of the interest payable on that portion of an underpayment attributable to negligence.

Under the tax code in effect during the relevant years, § 6653(a)(1) imposes a penalty equal to five percent of an underpayment if any part of that underpayment is attributable to negligence. Section 6653(a)(2) imposes an additional penalty equal to fifty percent of the interest payable on the amount of the underpayment attributable to negligence. Negligence under § 6653(a) is a "lack of due care or a failure to do what a reasonable and prudent person would do under the circumstances." *Chimblo*, 177 F.3d at 126 (quoting *Goldman*, 39 F.3d at 407) (alterations omitted); *see Heasley v. Commissioner*, 902 F.2d 380, 383 (5th Cir.1990). Once the Commissioner has imposed a negligence penalty, the taxpayer bears the burden of showing the absence of negligence. *Goldman*, 39 F.3d at 407; *Freytag v. Commissioner*, 904 F.2d 1011, 1017 (5th Cir.1990), *aff'd*, 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991).

Taxpayers claim that they should be relieved of the negligence penalties because they reasonably relied on "professional advice," namely the "investigatory work and opinions" of Taggart and Maxfield, in deciding to invest in the Partnerships. Taxpayers also insist that if an adviser performs a "conscientious and thorough investigation of the investment," they may justifiably rely on his advice even if he lacks prior industry experience. Good faith reliance on professional advice is a defense to negligence penalties. *See Durrett v. Commissioner*, 71 F.3d 515, 518 (5th Cir.1996); *Goldman*, 39 F.3d at 408 (citing *Illes v. Commissioner*, 982 F.2d 163, 166 (6th Cir.1992); *Howard v. Commissioner*, 931 F.2d 578, 582 (9th Cir. 1991)); *Collins v. Commissioner*, 857 F.2d 1383, 1386 (9th Cir.1988). However, "such reliance must be objectively reasonable." *Goldman*, 39 F.3d at 408 (citing *United States v. Boyle*, 469 U.S. 241, 250, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985)). In general, it is unreasonable to rely on an adviser who lacks knowledge about the industry in which the taxpayer is investing. *See*

*Chimblo*, 177 F.3d at 126 (upholding penalties where record did not show that adviser was qualified to evaluate investment); *David v. Commissioner*, 43 F.3d 788, 789–90 (2d Cir.1995) (per curiam) ("[R]eliance on expert advice is not reasonable where the 'expert' lacks knowledge of the business in which the taxpayers invested.") (citing *Goldman*, 39 F.3d at 408); *Freytag*, 904 F.2d at 1017 (upholding penalties where advisers had "no expertise whatsoever" regarding certain aspects of the investment); *Collins*, 857 F.2d at 1386 (upholding penalties where adviser "knew nothing firsthand" about the venture).

In *Boyle*, the Supreme Court observed that reliance on the advice of an accountant or attorney on a question of tax law, such as the existence of liability, is reasonable. *See Boyle*, 469 U.S. at 251, 105 S.Ct. 687. The Court explained that "[t]o require the taxpayer to challenge the attorney ... would nullify the very purpose of seeking the advice of a presumed expert in the first place." *Id. Boyle* thus stands for the proposition that reliance on an adviser is reasonable where the adviser has expertise in the relevant area. This Court in *Goldman* held the inverse, finding unreasonable taxpayers' reliance on an accountant's advice to invest in a partnership engaged in oil and gas exploration where the accountant lacked industry knowledge. *See Goldman*, 39 F.3d at 408; *accord David*, 43 F.3d at 789 (holding same). Similarly, this Court in *Chimblo* found unreasonable taxpayers' reliance on their family accountant when they invested in a publishing partnership, where the record failed to establish that the accountant was "qualified to render an expert opinion to the taxpayers as to the business merits" of the investment. *Chimblo*, 177 F.3d at 122, 126.

The crux of Taxpayers' claim on appeal is that an adviser with no background or experience in the relevant field can, through sufficient effort, become qualified to provide "expert" advice on which a

taxpayer reasonably may rely.[2] We need not decide the correctness of this claim, however, because Maxfield's efforts to learn about the Partnerships were clearly inadequate to compensate for his lack of experience in plastics recycling, and he never represented to Taxpayers that he had acquired knowledge adequate to evaluate essential aspects of the investment. Because Maxfield was uncertain whether the offering circulars correctly valued the recycling machines, he even proposed that Taxpayers hire an independent appraiser in the plastics industry to price the machines. Maxfield testified that he viewed his role as a "conveyor of information and ... impressions," and that he had "made it very clear" to Taxpayers that the investment was "their business decision," not his. Particularly in light of Taxpayers' sophistication, and considering the cautionary language in the offering memoranda, Taxpayers should have recognized the necessity of performing their own investigations. The record thus amply supports the tax court's conclusion that Taxpayers' reliance on Maxfield was objectively unreasonable.

■■■ Taxpayers' alleged reliance on Taggart was also unjustified. Entirely aside from the lack of any evidence in the record that Taxpayers actually conferred with Taggart about the Partnerships, Taggart had been retained by Roberts to draft the offering memoranda and tax opinions for Empire and Plymouth and held a 6.66 percent interest in a plastics recycling partnership. It is unreasonable for taxpayers to rely on the advice of someone who they know has a conflict of interest. *See Goldman,* 39 F.3d at 408 (upholding negligence penalties where expert relied on had "an inherent conflict of interest").

In sum, because we agree with the tax court that Taxpayers acted negligently in claiming the business and tax credits on their 1981 and 1982 tax returns, we affirm its decision upholding the § 6653(a) negligence penalties.

### B. *The Statute of Limitations Claim*

Taxpayers claim that the Commissioner's assessments on items relating to their investments in Foam for tax year 1982 were barred by the statute of limitations. They argue that certain consent forms they executed to extend the period of limitations were ineffective. We agree with the tax court that Taxpayers' consents to extend the statute of limitations were effective and therefore affirm the tax court's finding that the assessments were not time-barred.

#### 1. Statutory Framework

■■■ Foam is a partnership subject to the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub.L. 97–248, § 402, 96 Stat. 324, 26 U.S.C. § 6221 et seq. TEFRA provides for unified partnership audit and litigation procedures for making adjustments to partnership taxable income. *See Chimblo,* 177 F.3d at 121. In passing the Act, Congress aimed "to simplify for the [Internal Revenue] Service, the courts, and taxpayers the treatment of partnership items." 2 Arthur B. Willis et al., Partnership Taxation ¶ 20.01[3], at 20–6; *see also Chimblo,* 177 F.3d at 120–21 (discussing TEFRA provisions). This statutory goal is captured in I.R.C. § 6221, which provides that the tax treatment of partnership items "shall be determined at the partnership level." Partnerships are not themselves taxable entities; rather, they are computational entities that file

**2.** Taxpayers also cite *Anderson v. Commissioner,* 62 F.3d 1266, 1271 (10th Cir.1995) for the proposition that "one does not have to be an expert in an industry before he can invest in the industry ... or recommend an investment to another." Taxpayers' reliance on *Anderson* is misplaced. First, the statement is dictum made in the context of upholding the imposition of § 6653(a) negligence penalties. Second, the statement is contrary to the abundant authority requiring reliance on "expert" advice. *See Chimblo,* 177 F.3d at 126; *Durrett,* 71 F.3d at 518; *David,* 43 F.3d at 789–90; *Freytag,* 904 F.2d at 1017; *cf. Boyle,* 469 U.S. at 251, 105 S.Ct. 687.

information returns used to calculate the taxable income of the partnership, and thereby the tax liability of the individual partners. *See* Willis ¶ 20.01[2], at 20–4.

■ I.R.C. § 6229 establishes the period of limitations for making assessments against partners. Section 6229(a) provides that the period "shall not expire before the date which is 3 years after the later of—(1) the date on which the partnership return for such taxable year was filed, or (2) the last day for filing such return for such year." Section 6229(b) also provides for extension of the limitations period: The period "may be extended—(A) with respect to any partner, by an agreement entered into by the Secretary and such partner, and (B) with respect to all partners, by an agreement entered into by the Secretary and the tax matters partner." The tax matters partner ("TMP") is the partner designated to act as a liaison between the partnership and the Internal Revenue Service in administrative proceedings, and as a representative of the partnership in judicial proceedings. *See* Willis ¶ 20.04[1], at 20–51; *see also Transpac Drilling Venture 1982–12 v. Commissioner*, 147 F.3d 221, 223 (2d Cir.1998).

I.R.C. § 6223 sets forth the procedures for notifying individual partners of the commencement and outcome of administrative proceedings to determine adjustments to the tax treatment of partnership items. Section 6223 does not specify a period of time in which notices of the beginning of administrative proceedings ("NBAPs") and notices of the final partnership administrative adjustment ("FPAAs") must be issued relative to the date when returns are filed or become due. Instead, § 6223 establishes time limitations for when the notices must be sent to partners in relation to the date when those notices are mailed to the TMP. An NBAP must be mailed to partners no later than the 120th day before the FPAA is sent to the TMP, and an FPAA must be mailed to partners no later than the 60th day after the FPAA is sent to the TMP. *See* I.R.C. § 6223(d)(1)-(2). If the Commissioner fails to send either the NBAP or FPAA to a partner within these statutory time limits, the partner may elect to have his partnership items treated as nonpartnership items. *See* I.R.C. § 6223(e)(3)(B).

The issuance of an FPAA suspends the period of limitations for one year plus 150 days. *See* I.R.C. § 6229(d) (providing for one-year extension and incorporating 150–day extension from I.R.C. § 6226). A partner's election to treat partnership items as nonpartnership items extends the period of limitations for one year. *See* I.R.C. § 6229(f).

### 2. Analysis

Foam filed its partnership return for 1982 on March 16, 1983. Because the return was due on April 15, 1983, however, the statute of limitations for assessing taxes against the Foam partners was April 15, 1986. *See* § 6229(a). On November 5, 1985, Foam's TMP signed Form 872–P, extending the period for assessing taxes against all partners to June 30, 1987.

The following series of events forms the backdrop to the statute of limitations dispute:

| | |
|---|---|
| Nov. 5, 1985 | Foam's TMP signed Form 872–P, extending the period for assessing taxes against all partners to June 30, 1987. |
| Dec. 22, 1985 | Addington executed Form 872–A, consenting to an extension of time to assess tax until the 90th day after the IRS's receipt of a Form 872–T terminating their Form 872–A consent. |
| Mar. 13, 1986 | The Sanns signed Form 872–A, consenting to an extension of time to assess tax until the 90th day after the IRS's receipt of a Form 872–T terminating his Form 872–A consent. |

| | |
|---|---|
| Feb. 12, 1988 | Cohn signed Form 872, consenting to an extension of time to assess tax until December 31, 1989.[3] |
| Nov. 21, 1989 | Addington and the Sanns terminated their Forms 872–A by mailing to the IRS Forms 872–T. The Forms 872–T were received on Nov. 27, 1989, resulting in an extension of time to assess tax until February 25, 1990. |
| Dec. 20, 1989 | IRS mailed NBAPs to taxpayers and Foam's TMP, notifying them of the beginning of administrative proceedings to adjust partnership taxation. |
| Dec. 21, 1989 | IRS mailed FPAAs to taxpayers and Foam's TMP, notifying them of the final partnership administrative adjustment. |
| Jan. 31, 1990 | Addington, Cohn and the Sanns elected to treat their partnership items in Foam as nonpartnership items. |
| July 19–20, 1990 | The Commissioner sent notices of deficiency to Addington, Cohn, and the Sanns. |

Taxpayers argue that because Foam's TMP, by executing the Form 872–P, extended the period of limitations for *assessing* tax against all partners only until June 30, 1987, the time for making *adjustments* to the tax treatment of partnership items expired at that time, and their individual consents could not operate to extend that period. Taxpayers' argument is fatally flawed because it is premised on an erroneous conflation of the TEFRA provisions relating to assessments and to adjustment proceedings. Section 6229 limits the time for making assessments against individual partners. However, the provision sets forth no limitations whatsoever on the time in which adjustments can be made. Moreover, § 6223, as discussed above, establishes time limits only with respect to the period in which NBAPs and FPAAs must be mailed to partners relative to the date that they are mailed to the TMP; it does not incorporate the statute of limitations as set forth in § 6229 with respect to the mailing of adjustment notices or the initiation and completion of adjustment proceedings. Thus, the expiration of the Form 872–P

had absolutely no bearing on the Commissioner's ability to commence adjustment proceedings, and it certainly had no effect on Taxpayers' ability validly to execute consents to extend the period of time for making assessments against them. In sum, because taxpayers executed Forms 872–A and 872 extending the period of limitations for assessing tax against them under § 6229(b)(1), the Commissioner was not barred from making assessments against them even after the expiration of the Form 872–P.

The following occurrences extended the period of limitations applicable to taxpayers well beyond the expiration of the Form 872–P. First, the consents signed by Taxpayers extended the period of limitations to December 31, 1989 for Cohn, and to February 25, 1990 for Addington and the Sanns. Then, the issuance of the FPAA on December 21, 1989 extended the statute of limitations for one year and 150 days after that date, or May 20, 1991. *See* I.R.C. § 6229(d). Because the NBAPs were mailed to Taxpayers only one day before the FPAA was mailed to the TMP,

**3.** This was the third Form 872 that Cohn executed. He executed the other two on February 26, 1986 and March 6, 1987, extending

the limitations period to June 30, 1987 and December 31, 1988, respectively.

Taxpayers had the option to elect to have their partnership items treated as nonpartnership items. *See* I.R.C. § 6223(e)(3)(B). Taxpayers did so on January 31, 1990; this had the effect of extending the statute of limitations by one year from that date, or until January 31, 1991. Therefore, when the Commissioner sent the notices of deficiency to Taxpayers on July 19 and 20, 1990, he acted well within the period of limitations.

### C. Remaining Issues

Two issues remain in this appeal. First, Taxpayers claim that the tax court erred in holding that the Commissioner did not abuse his discretion in refusing to waive the valuation penalties assessed under I.R.C. § 6659. Second, Taxpayers argue that the tax court erred in upholding the § 6653 negligence penalties even though other investors in the plastics recycling partnerships were relieved of the penalties under settlement agreements. Because we agree with the tax court's analyses of these issues, we summarily dispose of them.

■ Section 6659(a), as in effect during the relevant tax years, provides for the imposition of a penalty where an underpayment of tax "is attributable to a valuation overstatement" equivalent to the proportion "of the underpayment so attributable." Under § 6659(e), the Commissioner "may waive ... the addition to the tax ... on a showing by the taxpayer that there was a reasonable basis for the valuation ... claimed on the return and that such claim was made in good faith." Taxpayers contend that the Commissioner should have waived the penalty because there was a reasonable basis for the valuation of the recycling machines claimed on their returns. As discussed above, however, neither Maxfield nor Taxpayers attempted independently to price the machines and relied instead on representations in the offering materials. Under these circumstances, Taxpayers' argument that the Commissioner abused his discre-

tion in refusing to waive the valuation overstatement penalties fails.

■ Taxpayers also contend that they should be afforded the same tax treatment as twenty-two "similarly situated" investors in plastics recycling partnerships who were relieved of the § 6653 negligence penalties. Twenty-one of those investors, however, bound themselves in piggyback agreements to the results of plastics recycling test cases in which the negligence penalties were ultimately abated. Because the Commissioner made the same settlement offer to Taxpayers as to those investors, but Taxpayers did not accept the offer, Taxpayers' claim that they are similarly situated to those investors is spurious. Taxpayers also claim that they should be accorded the same treatment as another investor, Elliott Miller, who was relieved of the negligence penalties in a settlement agreement with the Commissioner. We agree for the reasons stated by the tax court, however, that Taxpayers were not similarly situated to Miller and therefore were not entitled to the same settlement agreement.

### CONCLUSION

For the foregoing reasons, we affirm the decision of the tax court.